Filed 11/18/25  In re L.M. CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re L.M., a Person Coming Under the Juvenile Court Law. | G065467 |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | (Super. Ct. No. 17DP1327B) |
| Plaintiff and Respondent, | O P I N I O N |
| v. | |
| S.M., | |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, June Jee An, Judge. Affirmed.

Suzanne Davidson, by appointment of the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*　　　　\*　　　　\*

S.M. (Father) appeals the juvenile court's finding at the 18-month review hearing that he was provided reasonable reunification services with respect to his then 15-year-old daughter, L.M. Specifically, Father contends the Orange County Social Services Agency (the Agency) failed to provide in-person conjoint counseling with L.M. and liberalize his visits with her. At the same hearing, the juvenile court ordered L.M. returned to the custody of her mother, N.C., denied Father's request for custody, terminated Father's reunification services, and scheduled a family maintenance hearing pursuant to Welfare and Institutions Code section 364.[1] Father does not challenge these rulings, however.[2] He challenges only the court's finding that he was provided reasonable reunification services.

We conclude substantial evidence supports the court's finding of reasonable reunification services and affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Although Father's notice of appeal states he is appealing the denial of custody to him, he does not address that issue in his appellate briefing. He also does not contest either the court's award of custody to N.C. or the order terminating his reunification services. We therefore consider any challenge by Father to these aspects of the court's order waived. (*In re Sade C.* (1996) 13 Cal.4th 952, 994 [order challenged on appeal is presumed correct so appellant must raise claims of error and "'present argument and authority on each point made'"]; *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1345–1346, fn. 6 ["[A]n appellant's failure to raise an issue in its opening brief waives it on appeal"].)

FACTS AND PROCEDURAL HISTORY[3]

I.

BACKGROUND

Father and N.C. were together for 17 years, until approximately 2015 or early 2016. L.M. is one of their five children.

Father and N.C.'s involvement in juvenile dependency proceedings dates back to 2017, when N.C. left all five children alone overnight in a motel room and they became dependents of the court. In 2019 and 2021, two other panels of this court issued decisions detailing the extensive history of issues involving Father and N.C., including criminal allegations against Father of stalking and making criminal threats; both parents' incarceration, as well as mental health and substance abuse issues; and domestic violence.[4] As of February 2023, when the children were removed in the current proceedings, Father had full custody of them.

---

[3] The following summary is limited to certain background information and facts relevant to the juvenile court's finding of reasonable reunification services as to Father and L.M. made at the 18-month review hearing. Our recent unpublished decision in the related child welfare proceedings involving certain of L.M.'s siblings contains more detailed facts relating to the proceedings. (See *S.M. et al. v. Superior Court* (Sept. 11, 2025, G065442) [nonpub. opn.].)

[4] See *In re T.M.* (Feb. 15, 2019, G056588) [nonpub. opn.] [rejecting Father's appeal of order denying him visitation during pendency of juvenile dependency proceeding]; *In re T.M.* (Oct. 4, 2021, G060012) [nonpub. opn.] [affirming termination of dependency proceeding with exit orders granting full legal and physical custody of children to Father and granting monitored visitation to N.C.].

## II.

### REMOVAL, DETENTION, AND PETITION

In February 2023, the Agency received a report Father and his live-in girlfriend were involved in a dispute resulting in domestic violence while the children were home; the children heard but did not witness the incident. During the Agency's initial investigation, the children reported an incident involving Father and L.M.'s older sister, M.M., who was then 16 years old, that took place in the presence of the other children. M.M. reported Father became upset and stated he did not want her in the home and called her a "'disrespectful whore.'" Father also called her a "'slut'" and told her to go "'suck a dick, like your mother.'" Father then crushed a cup M.M. was holding against her chest and pushed her against the wall. Father also "smash[ed]" M.M.'s face before she called the police.

Father reportedly told L.M. when a "'bitch gets out of line'" he feels like beating them. The Agency also learned Father had been failing to provide for the children's basic needs, had been diagnosed with bipolar disorder, was not taking his medication, and had progressively worsened throughout the years to the point where he was not fit to care for the children.

On February 18, 2023, the Agency obtained a protective custody warrant to remove the children from Father's care. The Agency filed a petition on February 22, 2023, alleging L.M. came within section 300, subdivisions (a), (b)(1), (c) and (j), and later amended the petition. The juvenile court ordered the children detained from Father on February 23,

4

2023,[5] and released the children to N.C. Less than three weeks later, however, N.C. tested positive for narcotics, and L.M. and her siblings were removed from her care and placed in out-of-home care.

## III.

### JURISDICTION AND DISPOSITION

On May 2, 2023, the juvenile court found the allegations of the operative amended petition true, bringing the children within the definitions of section 300, subdivisions (a), (b)(1), (c), and (j). The court found vesting custody with Father and N.C. would be detrimental to the children and vesting custody with the Agency was necessary to serve their best interest. Father and N.C. were offered family reunification services.

## IV.

### INITIAL REUNIFICATION PERIOD AND
### COMBINED SIX/12 MONTH REVIEW HEARING

After the May 2023 disposition, L.M. expressed some trepidation about visiting with Father due to his past verbal abuse. Although she was willing to attend supervised visits, L.M. stated she might feel awkward seeing Father again and was afraid she might start crying.

An early July visit went well according to L.M., although just days earlier Father had stated to the Agency he would "'not be part of [the children's] life if they have contact with their mother. I don't want to be around a bunch of liars that hang out with a whore.'" In late August, Father gave L.M. a letter apologizing for his actions, and the two began to exchange text communications. By early September, however, Father had sent multiple inappropriate messages to L.M., ranging from pictures of his scantily-clad

---

[5] Father was found to be the presumed father of L.M. and the other minor children.

5

girlfriend to disparaging remarks and accusations about N.C. Father subsequently messaged the Agency that L.M. was blackmailing and threatening him. Father's obsessive barrages of inappropriate messages to L.M. included telling her to go "smoke weed" and "sell her [private part] for money." Although Father continued to participate in individual counseling and drug testing, his angry and unpredictable outbursts and communications remained of concern to the Agency.

By late 2023 and early 2024, Father had completed individual counseling, continued to submit negative drug testing results, and was attending 12-step meetings. L.M. stated in late 2023 she was enjoying visits with Father. By late December 2023, however, Father was denying that he bore any responsibility for the existence of the child welfare case and sending strings of inappropriate messages to L.M. that alternated between statements of affection for L.M. and insults to N.C.

By mid-January 2024, L.M. no longer wanted to visit with Father, complaining the visitation monitors did not intervene when he made inappropriate comments. L.M. blocked Father's number to stop his excessive, venting text messages. As of early April, L.M. noted she was not visiting Father as frequently because of her chiropractor appointments, wrestling team commitments, and visits with N.C., which together consumed much of the week. L.M. also noted Father continued to send her numerous messages and links and described Father as "'smothering'" her. L.M. reported she did not care to have a relationship with Father, but attended visits solely to see her younger sister.[6]

---

[6] We presume L.M. was referring to being able to see her younger sister at joint visits with Father because they did not share the same mother.

By early May 2024, L.M. noted she was visiting Father more frequently because he was making fewer comments to her about the case, because her continued relationship with her younger sister was important to her, and because of the things Father bought her. But L.M. began declining visits with Father again after receiving additional excessive text messages from him in which he would discuss details of the case in a bizarre manner. L.M. was addressing her relationship with Father in therapy and using what she has learned to inform her level of contact with him.

The combined six- and 12-month review hearing took place on May 14, 2024, during which Father stipulated—and the juvenile court found—reasonable services had been provided up to that point and services would continue to the 18-month review hearing. As part of those services, the Agency was ordered to refer L.M. to in-person conjoint counseling with Father.

V.

FINAL REUNIFICATION PERIOD LEADING UP TO 18-MONTH REVIEW HEARING

In late May 2024, the senior social worker assigned to the case inquired directly of several therapy providers about providing conjoint counseling for Father and L.M. Both providers responded they had limited or no availability. Soon thereafter, the social worker submitted the referral to the Agency's counseling services inbox for processing. In early August, the social worker followed up on the status of the referral, and one week later the referral was assigned to a specific service provider. The Agency provided the information regarding the service provider to Father and instructed him to begin the intake process as soon as possible. Meanwhile, having previously completed parenting education and individual counseling referrals, Father continued to submit negative drug test results and attend 12-step meetings.

7

Father also continued to complain to the Agency about the purportedly unjust allegations against him.

In July 2024, L.M.'s therapist reported to the social worker that L.M.'s diagnosis is posttraumatic stress disorder. The therapist further reported L.M. had said Father was manipulative and controlling and she would run away or even kill herself if she were forced to reunify with him. In early July 2024, L.M. sent the social worker a letter discussing Father's daily verbal abuse prior to her removal, her comfort in foster care, and her realization that she was "not the gay freak [m]y dad told me I was the day I was taken from his home." Later that month, L.M. reported she had again blocked her Father's phone number because she did not want to be insulted by him and complained he was trying to "'reel'" the children in through gifts and manipulation.

In late August 2024, L.M. attended a visit with Father but stressed she only did so because she was with her paternal grandmother and older sister and wanted to see her younger sister, who also was visiting with Father. L.M. further stated Father had suggested to her he might harm himself, but she did not believe he was actually suicidal; she believed he only said that to make her feel guilty. Meanwhile, Father continued to send hundreds of text messages to the social worker referencing, among other things, supposed conspiracies against him by one or more of his children and N.C., and accusing the social worker of brainwashing his children. Later in August 2024, the social worker received a termination report from the family counseling referral indicating the referral had expired because the children and caregivers never completed the intake process.

On September 30, 2024, at one of the case review hearings with the court, Father's counsel asked the court to order the Agency to evaluate liberalizing Father's visits with his children, including L.M. The Agency responded it did not object to assessing for liberalization but opposed immediate unsupervised contacts based on Father's continued inappropriate comments. The court ordered the Agency to assess liberalizing Father's visits. In early November, at Father's request, the court ordered the Agency to continue assessing whether to liberalize his visits.

After L.M. moved to a new foster home in October 2024, she reported to the social worker that Father "'still gets to be too much because he's mentally unstable.'" She also stated she did not need therapy with Father because she can handle talking to him and she was too busy with school, her own individual counseling, athletics, and her visitation schedule with Father. In mid-November, Father stated his concern that L.M.'s sexual orientation was an "'unresolved psychological issue due to [N.C.'s] actions.'" Meanwhile, L.M. continued to participate in individual therapy and also received counseling at her school. Father was continuing to vent to L.M. by text messages during this period, with L.M. reporting that some days were "fine" and others were "bad."

In early December 2024, after L.M. informed the court she would agree to unsupervised visits for the holidays with Father, the court directed the Agency again to conduct an assessment of unsupervised visits with Father, noting "[s]he is old enough to let the Court know what she wants. However, in all honesty, the Court doesn't know regarding the safety concerns on that . . . ." Just a few days later, however, L.M. told the social worker she was feeling "'iffy'" about unsupervised visits with Father, not out

of fear of Father, but because he was sometimes "'all over the place'" and continued to vent to her.

When the social worker explained to Father how his combative, accusatory, off-topic, and aggressive communication style might suggest he is unable to manage his adjustment disorder symptoms, he blamed the Agency for his communication styling, calling social services "'dirtbags.'" He asked the social worker if he should just "'lick a social workers balls'" to get liberalized visits. When the social worker suggested Father find more appropriate ways to cope with his frustrations than venting to L.M. and the social workers and caregivers, he replied that the "'fact that I go off on people is part of the script,'" insisted he is a "'genius producer,'" and said he was making a movie about his experience.

In early 2025, Father continued to complain about how long the case was taking, the direction it was going, and purported abuse directed at him by N.C. Father claimed L.M. was lying about him texting her and venting to her. L.M. still felt unsure about unmonitored contacts with Father and how her mental health would be affected if Father could say whatever he wanted to her.

In mid-February 2025, Father complained to the social worker that L.M. was being coached by N.C. and had been brainwashed. He also said L.M. was manipulating the social worker so she can be returned to N.C. Father followed that conversation with 12 text messages to the social worker, which included information about his girlfriend's net worth and a picture of the girlfriend in a showgirl outfit. Around this time, L.M. was also receiving "'bizarre'" messages from Father about his investments and businesses. L.M. reported Father was "'worse than normal'" and that he had been venting in text messages to her after she had provided testimony to the court.

As of March 2025, Father continued his rants to the Agency. The social worker noted: "[Father] continues to exhibit patterns of inappropriate communication with the youth, [L.M.], in ways she perceives as manipulative. The father utilizes his currently unmonitored communication with the youth as a method to further his own interests. The father also continues his pattern of blaming the child welfare case on others, through bizarre e-mail communication with the assigned social worker. . . . The Social Services Agency is concerned about the father's presence at the children's activities, due to hostility he directs towards their foster parents, and potential discomfort the children would be subjected to. These patterns highlight minimal behavioral changes by the father, possible unresolved anger management/mental health issues, and unwillingness to accept responsibility for his actions remain. In consideration of remaining concerns, the Social Services Agency is unable [sic] liberalize the father's visitation with the children at this time, as it would likely serve as an additional opportunity for these unhealthy patterns to continue."

VI.

FINAL REVIEW HEARING

The final review hearing began on January 21, 2025, and concluded on April 21, 2025. The juvenile court received into evidence the Agency's reports and heard testimony from L.M., Father, and the social worker, among others.

L.M. testified she never considered returning to Father's care and, although she had briefly considered overnight visits, she was "iffy" about that prospect now. Living with Father had been "okay" for about two years after she was released to his custody during their prior dependency proceedings, but she felt scared after seeing him hit her siblings. L.M. stated

11

Father was helping her with some financial support and by being there for her at her wrestling tournaments and supporting her when she cried. L.M. loved Father and enjoyed their weekly visits. Although she had seen some improvement in Father's level of texting, she remained concerned about Father's venting during in-person visits.

L.M. explained she was unsure about overnight contacts for multiple reasons: "some of it is trauma from the past, and some of it is a little scared. Not of, like, physical harm, but, like, mental harm." Father said inappropriate things to her even when the visitation monitor was present. L.M. was not physically afraid of Father and although he had said bad things about L.M. in the past, he had not done so in a while. L.M. felt her relationship with Father was about the same as it was at the beginning of the case.

During Father's testimony, he was asked whether any of his own conduct had precipitated the case. In response, he gave a rambling answer that did not acknowledge the sustained jurisdictional allegations. Father did not believe he had sent inappropriate texts to L.M. and said his texting "pales in comparison to what the courts have done to my family." He believed his visits with L.M. went well. Father acknowledged being informed he had adjustment disorder and said he was doing well with respect to that condition. He also noted he was open in his conversations and saw L.M. as an adult. He loved her, but admitted their relationship was "[l]imited." He described L.M. as "very smart, somewhat manipulative."

Father testified he asked for unsupervised visits every month. He felt the social worker was "doing the best she can, given the circumstances. Because this is probably one of the most toxic cases she's probably ever held on to." He acknowledged the social worker was helping him but said there

12

was "an agenda here. . . . otherwise, you guys wouldn't be paid, and I'm the bad guy." Father also denied ever being diagnosed as bipolar or currently being required to take medication.

After Father's testimony, L.M. read a letter to the court regarding her preferences, detailing her desire to return to N.C.'s care and expressing her deep connection to her mother.

The social worker also testified at the final review hearing. She testified Father had been compliant with his case plan but was unable to demonstrate what he had learned from those services. He continued to blame others for the Agency's involvement and was dismissive of the jurisdictional allegations that resulted in the children being removed. The social worker had concerns about Father's mental health, specifically his unresolved anger management and his lack of emotional regulation.

The social worker testified L.M. prioritized other activities, such as chiropractic appointments and her wrestling team activities, over visits with Father, and her primary motivation for visiting Father was to see her younger sister (who also visited with Father at the same time). The social worker explained she had not liberalized Father's visitation "due to the concern that he would use that unsupervised time to continue to communicate in ways that are not appropriate with the children." The social worker had seen text exchanges between L.M. and Father in which the two traded words of affection and L.M. told Father she loves him. The social worker believed L.M. responded to Father's messages because he is her dad and "of course she wants to have some type of relationship" with him. But she testified L.M. "continuously reports a lot of venting" from Father—so much, in fact, that the venting "feels pretty normalized to [L.M.]."

On April 21, 2025, the juvenile court granted N.C.'s motion under section 350, subdivision (c) with respect to L.M.[7] The court ordered L.M. returned to N.C.'s custody, continued the matter for a case plan review set for early May 2025, and set a family maintenance review hearing for September 2025. The court found pursuant to section 366.22, subdivision (a) that return of L.M. to N.C. would not create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of L.M. and her placement in foster care is no longer necessary or appropriate. The court further found reasonable services had been provided or offered to both parents. The court ordered the immediate return of L.M. to N.C. as the permanent plan.

The court denied Father's motion under section 350, subdivision (c), as to all of the children, including L.M., and it terminated his reunification services. In so doing, the court noted it maintained concerns "about [F]ather's possible mental health issues, and the ability to regulate his outbursts and lashing out at others. [¶] Father has continued to present in an erratic, compulsive and combative manner, as evidenced by his repeatedly blaming and lashing out at others, sending excessive and duplicate e-mails about non-case-related issues, and on his past and negative perspective on the siblings—on the mother of his children."

---

[7] Section 350, subdivision (c), provides in pertinent part: "At any hearing in which the probation department bears the burden of proof, after the presentation of evidence . . . the court, on motion of the minor, parent, or guardian, or on its own motion, shall order whatever action the law requires of it if the court, upon weighing all of the evidence then before it, finds that the burden of proof has not been met. That action includes, but is not limited to, the dismissal of the petition and release of the minor at a jurisdictional hearing, the return of the minor at an out-of-home review held prior to the permanency planning hearing, or the termination of jurisdiction at an in-home review."

Father timely appealed.

## DISCUSSION

## I.

### APPEALABILITY AND STANDING

The Agency contends Father's appeal should be dismissed because his notice of appeal is too narrow and does not encompass the specific challenge he is making to the juvenile court's finding that reasonable reunification services were provided to him. Specifically, Father's notice of appeal states he is appealing the denial of custody to him on April 21, 2025, and cites as appealable orders those issued on "1/21/2025, 2/3/25, 4/9/25, 4/16/25, 4/17/25, and 4/21/25." We disagree with the Agency's contention. The notice of appeal specifically appeals from one of the enumerated orders—the April 21, 2025 order—which included the court's finding Father was provided reasonable reunification services. The Agency is not prejudiced by Father's failure to specifically mention that finding in his notice of appeal. (*In re Joshua S.* (2007) 41 Cal.4th 261, 272 ["'[I]t is, and has been, the law of this state that notices of appeal are to be liberally construed so as to protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced'"].)

The Agency also contends Father lacks standing to appeal the court's finding of reasonable reunification services because L.M. was returned to the custody of her mother and reunification services are no longer a goal of the proceedings. We agree reunification is no longer a goal of the proceedings because L.M. is now in the custody of one of her parents and no longer in

15

foster care.[8] But Father is not challenging the court's *termination* of reunification services. He is appealing the finding he had been provided reasonable reunification services as of the final review hearing. As both parties seem to agree (and as courts have held), a finding that Father received reasonable reunification services may affect any request Father may make in the future to further attempt reunification with L.M. if she were to be again removed from N.C.'s custody. (*See In re A.O.* (2025) 111 Cal.App.5th 1048, 1061 ["Because a parent is aggrieved by an erroneous reasonable services finding, the parent may obtain appellate review of the finding by appealing the order in which it was made, even if the parent is not challenging any other part of that order"]; *In re A.G.* (2017) 12 Cal.App.5th 994, 1005 ["An erroneous reasonable services finding may have consequences for the parent if the child is removed again from the other parent's custody during the dependency proceedings [citation] or if the parent is involved in a future dependency proceeding"].)

We therefore consider Father's challenge to the finding of reasonable reunification services on the merits.

_____

[8] Where a child has been ordered returned to one parent after a period in foster care, the court "may, but is not required to, continue services for the noncustodial parent." (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 647; see *In re Erika W.* (1994) 28 Cal.App.4th 470, 475–478.) This is because once a child is placed back with a parent, "the court is not concerned with reunification, but with determining whether continued supervision is necessary in the family home." (*In re Gabriel L., supra,* 172 Cal.App.4th. at p. 650.) Under those circumstances, the juvenile court has broad discretion to determine whether any services need be provided in view of the child's best interests. (*Id.* at pp. 651–652.) For instance, "[a] court has discretion to terminate services for one parent even when ordering services for the other parent." (*Id.* at p. 651.)

16

## II.

### SUBSTANTIAL EVIDENCE SUPPORTS THE COURT'S FINDING OF REASONABLE REUNIFICATION SERVICES

At the 18-month review hearing, "[t]he court shall not order that a hearing pursuant to [s]ection 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian." (§ 366.22, subd. (b)(3)(C)(iii).) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

"The adequacy of reunification plans and the reasonableness of [the Agency's] efforts are judged according to the circumstances of each case." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) "To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .'" (*In re A.G., supra,* 12 Cal.App.5th at p. 1001.) "The standard is not whether the services provided were the best that might have been provided, but whether they were

17

reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

Father contends the court's finding that he was provided reasonable reunification services is not supported by substantial evidence because the record shows the Agency failed to ensure he received in-person conjoint counseling with L.M. and did not consider in good faith liberalizing his visitation with her. Father argues conjoint counseling would have helped his relationship with L.M., allowed him to demonstrate what he had learned from services, assisted him with communication, and helped him regulate his anger and emotions, all of which would have made it possible to liberalize his visitation. Having reviewed the record, we reject Father's contention that the absence of in-person conjoint counseling with L.M. and the lack of unsupervised visitation defeats the court's finding of reasonable reunification services.

The record shows the Agency took reasonable steps following the 12-month review hearing to reach out to service providers and arrange in-person conjoint therapy between Father and L.M. The social worker inquired of several therapy providers, but they had no or limited availability. The social worker then submitted the referral to the Agency's counseling services inbox for processing, and the referral was assigned in August 2024. The social worker provided the referral information to Father and urged him to begin the intake process. In September 2024, the social worker received a termination report from the Agency's family counseling referral, which indicated the referral had expired because the children and their caregivers did not complete the intake. The following month, in October 2024, Father was again provided and completed a family counseling referral. In the

18

meantime, L.M. had expressed frustration about being referred to therapy with Father and had said she did not think she needed it.

Father correctly notes the record does not reflect the Agency made efforts after October 2024 to ensure conjoint therapy with L.M. occurred. A minor's psychological wellbeing, however, is a relevant factor in deciding whether to force unwanted contact with a parent. (*In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1238.) And, here, the record shows L.M did not want to participate in counseling with Father. In addition, Father argued at later hearings for unsupervised visitation with L.M. and conjoint therapy and unsupervised visitation with two of his *other* children, but he did not bring to the court's attention the contention he is now raising that the Agency failed to ensure conjoint therapy occurred with L.M. Although we agree it was the Agency's—not Father's—responsibility to reasonably arrange for the therapy with L.M., the record supports a finding the Agency acted reasonably under the circumstances here in attempting to do so. In fulfilling its responsibilities, the Agency is not required to provide *perfect* services or take every conceivable step in order to satisfy its duty to provide reasonable services. (*Elijah R. v. Superior Court, supra,* 66 Cal.App.4th at p. 969; *In re Misako R.*(1991) 2 Cal.App.4th 538, 547.)

With respect to visitation, we find no merit in Father's contention the Agency failed in good faith to consider liberalized visitation with L.M. Father was provided his allotted amount of visitation, and the record shows Father never reached the point where unmonitored visits would have been appropriate. Father was never able to demonstrate an ability to consistently regulate his emotions and improve the substance and manner of his communications with L.M. We agree with the Agency the record reflects Father made repeated inappropriate and emotionally challenging comments

19

during the review period at issue, both to L.M. and the social worker, and repeatedly failed to accept any responsibility for L.M. and the other children being removed from his care. Father made inappropriate comments to L.M. despite the presence of a visitation monitor, which supports the Agency's concern about how he would conduct himself with L.M. if left unsupervised. In addition, L.M. expressed concern about the impact of more liberalized visitation on her mental health and wellbeing.

Viewing the evidence in the light most favorable to the Agency and considering the testimony heard by the court, we conclude substantial evidence supports the court's finding, by clear and convincing evidence, that the Agency provided Father reasonable reunification services.

DISPOSITION

The juvenile court's finding and order on April 21, 2025, that appellant S.M. was provided reasonable reunification services as to minor L.M. is affirmed.


GOODING, J.

WE CONCUR:


DELANEY, ACTING P. J.


SCOTT, J.

20